UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,    Case No 17-cr-187-pp

        Plaintiff,

v.

LAURA L. WALTON,

        Defendant.

_____

**ORDER GRANTING DEFENDANT'S MOTION TO REOPEN DETENTION (DKT. NO. 34), BUT DENYING DEFENDANT'S REQUEST FOR RELEASE PENDING SENTENCING (DKT. NO. 34)**

_____

On November 7, 2017, the grand jury returned a ten-count indictment charging Deon Batton and Laura Walton with five counts of Hobbs Act robbery and five counts of brandishing a firearm in furtherance of a Hobbs Act Robbery. Dkt. No. 11. On two days in October 2017, the two committed armed robberies of a Subway sandwich store, a Taco Bell, a GameStop store, another Subway, and a Cousins Subs. The first two robberies took place on October 9, 2017; the last three took place on October 11, 2017. Id. Laura Walton was the gunman in the first robbery; both defendants were armed in the second one; both were armed in the third; Deon Batton actually discharged a firearm during the fourth robbery, and the government alleges that Laura Walton kicked one of the victims (Walton does not remember this); both defendants were armed in the final robbery. Dkt. No. 33 at 16-19. After her arrest, Walton confessed to the robberies. She told law enforcement that she committed the

1

robberies because she needed money. She selected restaurants as targets because she had worked at restaurants, and knew how they operated. They had robbed the GameStop on October 11 only because a nearby Pizza Hut had been too crowded. Walton admitted to being armed at each robbery. Batton told law enforcement that the robberies were Walton's idea. Id. at 19-20.

Walton first appeared in federal court on October 27, 2017. Dkt. No. 4. Pretrial services prepared a bond study for that hearing. Dkt. No. 3. It noted that Walton had a good relationship with her parents, and that if released, she could live with her mother, Jarnell Walton. Walton did not have a passport. At the time of her arrest, Walton had been working anywhere from twenty-six to sixty hours a week at Mitchell Manor, an assisted living and nursing facility in West Allis, making $13 an hour. It also appeared that she was receiving food stamps. Pretrial services reported that Walton had a two-year-old son, whose father was not involved in their lives on a consistent basis.

The bond study showed that, at the age of twenty-six, Walton had no prior criminal history; all of her encounters with law enforcement involved traffic violations. She reported no mental health problems, stated that she'd used marijuana only once in her life, and drank only socially. The only issues of note reported by pretrial services were medical ones: Walton reported suffering from asthma, migraines, and arthritis and a herniated disk in her back which caused her pain. She had a prescription for Imitrex for the headaches and an opioid pain killer for her back.

The study noted one other thing: that Walton's mother had reported to the pretrial services officer that Walton "may have" abused opiates by taking Oxycodone and Percocet that hadn't been prescribed to her.

Magistrate Judge Joseph considered all of this (as well as information she learned at the hearing, such as the fact that Walton is a high school graduate). Dkt. No. 4. According to the minutes of the detention hearing, however, Judge Joseph ordered Walton detained, because she had been involved in five armed robberies where loaded firearms had been brandished, and had admitted that fact after her arrest. Id.

On December 29, 2017—about two months later—Walton's counsel asked Judge Joseph to reopen the detention hearing. Dkt. No. 19. He told the court that Walton's mother, Jarnell, was willing to act as Walton's third-party custodian. Id. at 2. He explained that Walton had been free of opiates for more than seventy-five days, which meant that she was ready to start drug treatment. Id. at 3. He noted that Walton would not have any association with Deon Batton, and that his review of the discovery did not support the government's assertion that Walton had instigated the robberies. Id.

Counsel particularly emphasized Walton's health issues. He explained that Walton already had had procedures to relieve the pain in her back, and that she needed another procedure—"radio frequency ablation"—to deaden the pain nerve root. Id. at 3. Counsel argued that because this treatment would relieve Walton's pain in the long term, it could help "to reduce the need for opioid-based pain medication to which Laura became addicted." Id. Counsel

3

also mentioned Walton's asthma, migraines and—not mentioned in the bond study—sickle cell disease. Id. Counsel stated that at the time Walton was arrested, she "had been abusing opioids for a long time," but that since being in custody, she had been attending AA meetings at the Dodge County Detention Facility. Id. at 4. Counsel also argued that Walton had displayed symptoms of mental health issues, and was willing to submit to a mental health evaluation. Id.

Finally, counsel explained that Walton needed to make arrangements for her three-year-old son—legal options for custody—as well as helping him manage his trauma over the likely looming federal sentence. Id. For all of these reasons, counsel argued that Walton had great incentive to comply with any conditions of release. Id. at 4-5.

In its response, the government reiterated the serious, violent and aggressive nature of the robberies, and Walton's role in them. Dkt. No. 20. The government also pointed out that Walton had been living with her mother—the person who now was willing to be her third-party custodian—at the time she'd committed these crimes; that fact had not prevented her from committing the robberies. Id.

Judge Joseph denied Walton's request for release. Dkt. No. 23. She concluded that Walton's motion presented sufficient facts to rebut the presumption of detention raised by 18 U.S.C. §3142(e), and the fact that Walton was charged with committing crimes of violence. Id. at 3. But Judge Joseph noted that the question of whether Walton had rebutted the §3142(e)

4

presumption was only one of several factors a court must weigh in deciding whether a defendant posed a risk of flight or a danger to the community. Looking at all of the factors a court must consider under 18 U.S.C. §3142(g), Judge Joseph concluded that the government had met its burden of persuasion to show that there was no condition or combination of conditions that would assure that Walton was not a danger to the community. Id. at 4.

Recounting the serious and violent nature of the charges, Judge Joseph explained that she found it "particularly relevant to the assessment of future dangerousness . . . that these five armed robberies were allegedly committed over a mere three day time span." Id. Judge Joseph acknowledged Walton's "admirable" history of juggling work, school and family responsibilities, but found that "her alleged crime spree suggests unpredictability, a lack of control, or impulsiveness which would pose a serious risk of future danger to the community." Id. Judge Joseph agreed that Walton's desire to obtain medical treatment, to seek drug and mental health treatment, to make arrangements for her son and to prepare him for her possible incarceration was "valid and sympathetic," but concluded that it did not "overcome the finding that Walton's alleged crime spree suggests a serious risk of danger to the community." Id.

After a change of counsel (not related to Walton), this court scheduled a status conference for June 7, 2018. Dkt. No. 32. At that status conference, defense counsel reported that the defendant had signed a plea agreement. The court scheduled a change of plea hearing for June 22, 2018. Id. The parties filed a plea agreement on June 18, 2018, which provided for Walton to plead

5

guilty to the five robbery counts and the final §924(c) count. Dkt. No. 33. Under the indictment, Walton had faced a 107-year mandatory minimum—seven years on the first §924(c) count, and a consecutive twenty-five year sentence on each of the following four §924(c) counts. The plea agreement reduced her mandatory minimum exposure to seven years. Walton appeared before this court, and entered her guilty plea in accordance with the plea agreement, on June 22, 2018. Dkt. No. 37. The court scheduled the sentencing hearing for September 26, 2018—three months from now.

Later on the day of the guilty plea, Walton's current counsel filed this motion to reopen the detention determination, asking the court to release Walton pending the September 26, 2018 sentencing hearing. Dkt. No. 34. Counsel assured the court that she did not "make this motion lightly or casually," and that she was doing so "only because of the unique condition of Ms. Walton." Id. at 2. Counsel listed four reasons that Walton was seeking release pending sentencing: (1) To complete health procedures she had been undergoing at the time of her arrest; (2) to obtain drug counseling before she is incarcerated; (3) to provide respite for her mother, who had to assume the care of Walton's three-year-old son when Walton was arrested; and (4) to spend time with her son, to help him cope with the fact that Walton will be away from him for a significant time after sentencing. Id.

Counsel argued that Walton no longer posed a danger to the community because of: (1) lack of prior criminal history; (2) because she had been clean of any drug use for the eight months she had been in custody; (3) because she

6

now had insight into her addiction and a desire to obtain treatment; (4) because she is inclined to be a home-body, which will make monitoring easier; and (5) because she has the support of her family who, post-arrest, is more aware of her addiction and criminality. Id.

Counsel was frank in informing the court that the government did not join her request to release Walton pending sentencing. Id. at 3. She explained that, as she understood it, one of the reasons the government opposed the request was because of a "sincere concern that a temporary reunification with Ms. Walton, sure to be followed by yet another separation—this time for even longer—could be traumatic for her little boy." Id. To address this concern, defense counsel had consulted with a child psychologist; she attached to the motion a brief summary of what she'd learned from that consultation. Id. Counsel also had attached a psychological evaluation report, upon which counsel proposed to rely to argue about Walton's "emotional fragility under the conditions of her current confinement." Id.

The court held a hearing on the motion. At the hearing, defense counsel was succinct, in an effort to be economical with the court's time and the prosecutor's. Rather than rehashing information she already had provided, counsel focused on additional information. First, she reminded the court that the defendant had been clean for nine months and two weeks, despite the fact that controlled substances are available to inmates in jails and pre-trial detention facilities. She told the court that Walton now realizes that she has a problem with drugs, and that she needs help. She should have acknowledged it

7

earlier, but she knows it now. Counsel indicated that Walton was willing to use Vivitrol® to help her deal with her addiction. She explained that if released, Walton would be living with her mother and her sister (who were present in court), who had not been aware of Walton's addiction before her arrest, but who would monitor her and call the court at the first sign of any use.

Second, counsel reminded the court that Walton had started receiving radio frequency ablation and other treatment for her severe back pain before her arrest, and stated that Walton needed another treatment. Walton wanted to obtain that treatment before going into custody.

Third, counsel stated that her proposal was that if the court were to release Walton, Walton would be placed on location monitoring. She would be in one of two places at any given time—in treatment, or at home with her son. Counsel stated that she was not proposing that Walton work, or go anywhere else, during the time between the proposed release and the sentencing date.

Finally, counsel explained to the court that Walton had been moved from Dodge County to the Kenosha County Detention Center. Walton had not been moved due to any misbehavior or misconduct on her part; quite the contrary. Counsel opined that, based on what she'd experienced, this move had been very detrimental to Walton's emotional well-being. At Dodge, Walton had had a job, had been involved in programming, had attended church. None of that was possible at KCDC. At Dodge, Walton had been able to speak with her son by telephone fairly frequently. The phone system at KCDC was either broken or unavailable, and Walton has fewer opportunities there to talk with her son.

Counsel reminded the court that KCDC was not particularly clean. In all, counsel told the court that Walton has been more depressed, more tearful, more stressed and emotionally fragile since being moved to KCDC.

The government began by reminding the court that now that Walton had pled guilty to a crime of violence, §3143(a) provided that the court "shall detain" the defendant. The prosecutor told the court that defense counsel had notified her a couple of weeks ago that Walton was thinking of asking for release between the date of the guilty plea and the date of sentencing, so the prosecutor had had a good deal of time to think about it. She had concluded, after that thought, that there were three reasons the government could not support a request for release.

First, the government stressed the violence of the robberies to which Walton had pled guilty. The prosecutor emphasized that Walton was not a "follower" in these crimes—she was an equal participant. She'd committed a string of armed robberies, with a loaded gun, over a three-day span, despite having a decent job at Mitchell Manor. Counsel described the terror Walton and Batton had caused the people in these restaurants and stores, and told the court that the government would have to notify those victims of Walton's release. She speculated that this might traumatize some of them even further.

Second, counsel discussed the fact that the parties now knew—as they had not known when Walton was arrested—that Walton had been addicted to, and using, opioids supplied by Batton at the time she'd committed these robberies. Counsel reminded the court that Walton's mother had had an

9

"inkling" at the time of the bond study that Walton had been abusing prescription drugs, but had not been able to exert control over Walton then. She found it difficult to imagine that Walton's family could exert control over Walton now. Counsel pointed out that Walton was facing a mandatory minimum sentence of seven years, even without taking into account any consecutive sentence on the robberies, a situation that would put anyone under a great deal of stress. Walton, counsel pointed out, had shown that when she was under stress, her behavior was unpredictable.

Finally, counsel turned to the question of Walton's little boy. She speculated that, during the nine months or so that Walton has been in custody, the three-year-old likely has adjusted to his new normal. Counsel expressed concern that if Walton were to get out, spend time with her son, and then go away again, it might threaten that adjustment, and reopen old wounds. The prosecutor stated that she had read the summary of the information the child psychologist had provided defense counsel, but stated that she still was concerned that release would do more harm than good to a three-year-old boy.

The court gave Walton an opportunity to speak. Walton told the court that she had never said that what she did was right, but that she had now had time to reflect and to think. She told the court that she realized she needed drug treatment. She stated that she was going to obtain insurance through the state, and then use that to fund her participation in the Vivitrol® protocol. She stated that she wanted to help get her son settled in school, and to be able to talk to him in person about what had happened. She noted that she had

dropped him off with family and then been arrested; she'd never had the chance to tell him goodbye, or to explain why she was disappearing. She wanted to be able to tell him that she wasn't just abandoning him. Walton told the court that she wanted to try to take advantage of all the treatment options her lawyer had discussed—health, mental health and drug counseling—during any time she was out.

Two top-notch, dedicated, talented lawyers have presented the government and the court with a great deal of information—more than the court normally would have about a defendant at the time of a guilty plea. The court agrees with defense counsel, and with Judge Joseph, that there is much in that information that is positive. But the court cannot grant the defendant's request.

Section 3143(a)(2) mandates that when a defendant has been found guilty of a crime of violence—as Walton now has been—the court "shall order" that that person be detained unless (a) the court finds that there is a "substantial likelihood" that it will grant a motion for acquittal or a new trial, or (b) the prosecutor has recommended that the court impose a sentence that does not include imprisonment; or (c) the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." As defense counsel correctly acknowledged, the first two conditions are not applicable here. The only option I have for releasing Laura Walton, now that she has pled guilty to five counts of armed robbery and one count of brandishing a gun during a crime of violence, would be to find by

clear and convincing evidence that she does not pose a danger to another person, or to the community. I cannot make that finding.

Laura Walton made it for twenty-six years without committing a single crime—not even a minor one. Then, on two separate days in October of last year, she went from zero to eighty, as the saying goes. Despite working a good—although, admittedly, tough—job as a certified nursing assistant, and making $13 an hour, she claims that she needed money. To get that money, she took a loaded handgun into five different businesses, with customers present. She didn't select the businesses by accident. She deliberately chose restaurants, because she knew how they operated, having worked at restaurants in the past. She screamed at employees and customers. She took money out of registers. She pointed her gun at people. This isn't someone who, finding herself in financial difficulty, snuck a little money out of the petty cash box at her job, or took someone's backpack on the bus while they were sleeping. These were violent, ugly robberies that likely will have had lasting impacts on the victims.

At the time she decided to commit these robberies, Walton was living with her mother. She believed that she was hiding her drug addiction, but her mother told the pretrial services officer that she suspected that her daughter was abusing prescription opioids. It now appears that Walton was getting at least some of those drugs from Deon Batton, her co-actor in these robberies. Living with a supportive, caring mother did not prevent Walton from committing these robberies.

At the time she decided to commit these robberies, Walton had health problems—asthma, migraine headaches, painful back issues. Perhaps she became addicted to opioids because she originally was prescribed them for some of these medical problems. The fact that she was in pain, and needed medical care, did not prevent her from committing these crimes.

At the time she committed these robberies, Walton had a son—a little boy who needed her. I have no doubt that that little boy, who hasn't done anything to deserve it, has been deeply impacted by the fact that his mother just disappeared one day after dropping him off. I don't know, but I imagine he didn't understand what was going on then. He may not understand what's going on now. Having him in her life, however, did not stop Walton from committing these crimes.

The defense and the government disagree (respectfully and professionally) over whether it would be more or less harmful for Walton to reunite with her son for three short months before going to prison for whatever time she receives. The defense points to Dr. Thompson's view that if the relationship between Walton and her son is loving (and not abusive), it would be better for her son in the long run if Walton could explain to him, face-to-face, what is going to happen. Dr. Thompson indicates that his three-year-old self would be able to process that information better than his two-year-old self would have been able to do. The government is doubtful, concerned that Walton's return could be disruptive.

I am not a child psychologist. I can imagine that spending a short time with a loving, committed, sober, involved mother might help prepare a child for her future absence. I can imagine that such an experience might make separation all the harder. I don't know which would be true. I know only that it is heartbreaking that he has had to go through this experience to this point.

The factor that most concerns me is the one identified by the government, and one that I mentioned during the hearing. I don't know what in the world would cause a law-abiding twenty-six-year-old with a supportive family and a little boy who needs her to suddenly go on a violent robbery spree. But it appears that she was under financial stress, and she was fighting an addiction that is, based on what I see with alarming frequency, brutal and extremely difficult to fight. If I were to release Walton, her financial situation would not have changed, and she would still have an addiction to fight. She would still be under stress—perhaps more stress—and she does not react well to stress.

Granted, the defense and Walton argue that she has been clean for the entire time she has been in custody. I will have to take Walton's word for that—I have no urinalysis results to back it up. Walton indicates that she has now confronted the fact that she has a problem (something she didn't appear to have done at the time she first appeared before Judge Joseph), and that she wants help. She has stated her intention to obtain insurance, and to get on Vivitrol®. But Walton is asking to be released back into the environment where she was using drugs before her arrest. Perhaps she could no longer obtain

them from Deon Batton, but it is unlikely that she would not know where she could obtain them. Location monitoring would not prevent that. Going through the process of filling out paperwork to get on state insurance can be frustrating, and time-consuming. There is no guarantee that one will get the insurance, and no guarantee that one will be able to participate in the Vivitrol® treatment. Walton would be subject to these stresses.

There is support for this in some of the findings Dr. Dolezol made in her mental health evaluation. Dkt. No. 36. Dr. Dolezol indicates that Walton is easily subject to influence, and likely to do things that others suggest to avoid loss and abandonment. She indicates that Walton is experiencing feelings such as depression and anxiety—feelings she medicated with opioids before her arrest. She indicates that Walton misperceives and misinterprets situations, which can negatively impact her decision making.

That trait may have been on display at today's hearing. Walton briefly mentioned the crime she committed, by indicating that she "never said" that what she did was right. After that brief, and slightly defensive, mention, she focused on what she planned to do on release. I got the sense that she does not have a grasp of just how serious these crimes were. If that is the case, it gives me even more concern about Walton's ability to handle stress and make good judgments if released.

For these reasons, I cannot find, by clear and convincing evidence, that Laura Walton is not likely to pose a danger to a person, or to the community, if released.

The court **GRANTS** the defendant's motion to reopen the detention proceedings. Dkt. No. 34.

The court **DENIES** the defendant's request for release pending sentencing. Dkt. No. 34.

Dated in Milwaukee, Wisconsin this 27th day of June, 2018.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**